UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br><br>　　　　Plaintiff,<br><br>vs.<br><br>Eugene Clifton Holley, Jr.,<br><br>　　　　Defendant. | CR 11-3384-TUC-CKJ (BPV)<br><br>**REPORT AND RECOMMENDATION** |

　　　　This matter was referred to Magistrate Judge Velasco for all pretrial matters. On November 23, 2011, Defendant Eugene Clifton Holley filed a Motion to Suppress (Doc. 20) based on an illegal seizure and search in violation of the Fourth Amendment, and Supplemental Motion to Suppress Statements (Violation of Miranda) (Doc. 28). At Judge Velasco's request, the motions were heard by Magistrate Judge Marshall. The Supplemental Motion to Suppress Statements

(Violation of Miranda) (Doc. 28) was resolved by stipulation and the Magistrate Judge recommends that it be denied as moot.

The Motion to Suppress (Doc. 25) was heard by Judge Marshall on June 4, 2012. Defendant Holley was present at the hearing, was represented by counsel, and testified on his own behalf. The Government presented the testimony of Border Patrol Agent Maurice Alvarenga. The witnesses were examined, cross-examined, and questioned by the Court. Having considered the matter, the Magistrate Judge submits the following Findings of Fact and Conclusions of Law and recommends that Defendant Holley's Motion be denied.

I.   **FINDINGS OF FACT**

At about 6:30 a.m. on August 29, 2011, Agent Alvarenga was observing traffic on Arizona Highway 82 at mile marker 29.5, which is about 2.5 miles west of the Sonoita Border Patrol Station, when he noticed two vehicles traveling eastbound very close together. The lead vehicle, which was being driven by Defendant Holley, was a maroon Nissan and it was followed by a white late model Chevrolet Monte Carlo. Believing the vehicles might be traveling in tandem, and knowing this was a technique employed by drug and human traffickers, Agent Alvarenga decided to follow the vehicles.

At the junction of State Highways 82 and 83, the vehicles turned north on State Highway 83 and Agent Alvarenga, who had now caught-up to the vehicles, began following them, remaining two or three car-lengths behind the Monte Carlo. After the vehicles turned northbound on State Highway 83, the agent remained

1   behind them for eight or nine miles and noticed the driver of the maroon Nissan
2   looking in his rearview mirror.
3    Knowing that an immigration checkpoint was set-up on northbound Highway
4   83 at mile marker 41, Agent Alvarenga did not intend to stop the vehicles.  However
5   at the Empire Ranch pull-out, which is approximately located at mile marker 39.5
6   and is where the first signage warning of the immigration checkpoint appears,  the
7   maroon Nissan pulled off on the right-side of the highway, turned his vehicle toward
8   the roadway, and came to a stop.  Agent Alvarenga radioed in that he was going to
9   approach the vehicle.  He then pulled in behind the Nissan and activated his overhead
10  emergency lights for safety reasons and intended to check if the driver of the Nissan
11  was lost or having car problems.
12   Agent Alvarenga got out of his vehicle and approached the passenger side of
13  the Nissan.  As he passed the rear of the vehicle he noticed "blocks covered with a
14  Mexican blanket."  He noticed that one block was only halfway covered and was
15  wrapped in cellophane.  Suspecting the blocks were marijuana, he asked the driver,
16  Defendant Holley, for permission to search the vehicle and he responded,
17  "Absolutely not."  Alvarenga then told Holley that he was going to conduct and K-9
18  sniff of the vehicle and told Holley to turn-off the ignition and exit the vehicle.
19   K-9 Agent Haller, who happened to be driving by, pulled in shortly after
20  Agent Alvarenga requested a K-9 unit.  Another agent, Agent Knight, also arrived on
21  the scene.  While Agent Alvarenga ran a records check on the Nissan, Agent Haller's
22

K-9 inspected the vehicle and alerted to the odor of marijuana emanating from the blocks in the car.

Defendant Holley explained that he pulled into the pull-out because he was being tailgated by the white Monte Carlo. He had also noticed that low fuel light had come on, so he intended to make a U-turn and head back in the direction from which he had come so he could return to a gas station he had seen. As he pulled off the road and began his U-turn, Agent Alvarenga, as he was entering the pull-out, blocked Holley's view of oncoming traffic and thereby prevented him from completing his U-turn. Agent Alvarenga then turned on his overhead emergency lights and Holley believed he was not free to go.

## II.   CONCLUSIONS OF LAW

Holley contends that Agent Alvarenga did not have reasonable suspicion to support the stop of his vehicle. The Government contends that Holley voluntarily pulled off the highway without any prompting by Agent Alvarenga and voluntarily came to a stop. Because he did so, the contact was voluntary and did not require any suspicion.

The parties' do not dispute that Alvarenga needed reasonable suspicion to stop or seize Holley's vehicle. *United States v. Diaz-Juarez*, 299 F.3d 1138 (9th Cir.2002). Holley asks the Court to review the stop under *United States v. Arvizu*, 534 U.S. 266 (2002), and determine whether under the totality of the circumstances Agent Alvarenga had a particularized and objective basis for suspicion of criminal activity. The Government argues that the Court need not conduct such an inquiry.

4

1  Citing *United States v. Al Nasser*, 479 F.3d 1166 (9th Cir.2007), *amended and
2  superseded by* 555 F.3d 722 (9th Cir. 2009), the Government claims that there was no
3  stop because Holley stopped voluntarily without Agent Alvarenga directing him to
4  do so.  The Fourth Amendment protects an individual's right to be free from an
5  *unlawful* seizure.  *Al Nasser*, 555 F.3d at 725.  For a seizure to be found unlawful, it
6  must first be established that a seizure happened at all.  *Tennessee v. Garner*, 471
7  U.S. 1, 7 (1985).  The threshold question, then, is whether the events that led up to
8  Agent Alvarenga's encounter with Holley amounted to a seizure or were consensual.

9       In *United States v. Judge*, 501 F.2d 1348 (9th Cir.1974), Border Patrol Agent
10  Walters, in uniform and driving a marked car, began following a truck driven by
11  Judge after noticing that it had a type of cover used to transport aliens and because it
12  had a paper license plate indicating the recent transfer of the registration.  *Id*.  The
13  truck pulled into the parking lot of a closed fruit market and, as Judge was leaving
14  the truck, Agent Walters approached and began a conversation.  *Id*. at 1349.  After a
15  few minutes, the agent requested and was granted permission to inspect the truck.
16  When Judge unlocked the cover, the agent discovered marijuana.  *Id.*  Relying on
17  *Almeida-Sanchez v. United States*, 413 U.S. 266 (1973), the Ninth Circuit rejected
18  Judge's argument that he submitted to Walter's show of authority.  The court
19  determined that because Judge stopped the truck voluntarily, and the agent "in no
20  way ordered or requested him to do so, there was no 'stop' of the vehicle as would
21  require a 'founded suspicion' on the part of Walters."  *Id*.

22

5

Although Holley, like Judge, stopped his vehicle voluntarily, this case does not fit without further examination into the rule stated in *Judge*. The obvious distinguishing facts are that, in this case, Holley was not exiting the vehicle as Agent Alvarenga approached, and in *Judge*, Agent Walters never activated his overhead lights. These facts are significant because Holley contends he did not intend to stop but had pulled over to execute a U-turn and was only waiting for a clear sight line of the road. He did not complete the U-turn because Agent Alvarenga's vehicle was initially blocking his view of the road and then believed he could not proceed when the agent activated his overhead lights.

Although not without distinguishing factors of its own, the *Al Nasser* decision offers the best guidance in resolving this case. In *Al Nasser*, border patrol agents were patrolling a highway running north from the Mexican border and they stopped two vehicles they suspected were smuggling illegal aliens. 555 F.3d at 724. The agents were assisted by local law enforcement, and "there were five vehicles stopped on the road, three law enforcement vehicles with light bars flashing on two of them," and the two suspect vehicles. *Id*. Al Nasser then approached the scene in his vehicle and a Border Patrol agent shined his flashlight toward Al Nasser's vehicle so he would be seen and not hit. *Id*. Although the agent suspected Al Nasser of transporting illegal aliens, he decided not to stop him because the "agents already had their hands full." *Id*. "But Al Nasser stopped anyway, in the middle of the road" and an agent found illegal aliens in the vehicle. *Id*. at 724-25.

6

Al Nasser was convicted of knowingly transporting illegal aliens and on appeal he argued that the evidence against him should have been suppressed "because he was stopped in the absence of reasonable suspicion." *Id*. at 725. The Ninth Circuit framed the issue as follows:

> What if the police do not intend to stop someone, but a person thinks that he is being stopped? Must that unintended stop still be supported by reasonable suspicion in order to prevent suppression of its fruits? Does the "objective examination of police conduct, as required in *Whren v. United States* [fn5: 517 U.S. 806, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996),] for a vehicle stop brought about by police action undertaken to effect the stop, mean that if a reasonable person would think that he was being stopped, then the person is "seized" within the meaning of the Fourth Amendment, even if the police do not want the person to stop and intended for him to go on about his business without stopping?

*Al Nasser*, 555 F.3d at 725. After examining United States Supreme Court precedent, including *Brower v. County of Inyo*, 489 U.S. 593 (1989), *Scott v. Harris*, 550 U.S. 372 (2007), and *Brendlin v. California*, 551 U.S. 249 (2007), requiring that police conduct be "intentional" before a seizure exists under the Fourth Amendment, the Ninth Circuit rejected Al Nasser's claim that he was seized by the agents. 555 F.3d at 727-32. The court reasoned:

> The language in *Brower, Scott,* and *Brendlin* fits this case. Al Nasser's stop was governmentally "caused" in a "but for" sense: he would not have stopped if the Border Patrol agents and tribal officer had not been present, with lights flashing on three stopped government vehicles next to two stopped civilian vehicles. But, Al Nasser's stop was not a "seizure," because the government actors (who wanted him to go away, not stop) clearly did not pull over the two other vehicles, engage the emergency lights of two police vehicles, and shine a flashlight at Al Nasser's vehicle as he approached and passed the scene in order to make Al Nasser stoop. Although they intended to stop the two other vehicles, they did not intend to curtail Al Nasser's freedom

of movement (except perhaps to the extent he needed to go around the stopped vehicles). The *sine qua non* for a Fourth Amendment seizure was missing because the means that led him to the stop – the lights, stopped vehicles and officer directing traffic – were not "means intentionally applied" to bring about the stop of Al Nasser's car. Those actions, without more, did not demonstrate an intent to stop every vehicle that drove past.

This case is therefore distinct from *Brendlin*, in which the officer's show of authority was unambiguously directed at the vehicle in which Brendlin was a passenger and caused it to pull over, thereby limiting Brendlin's freedom of movement. Rather, this case is similar to the hypothetical "incidental restrictions" the Court discussed in *Brendlin*. The intent of the officers directing traffic around an accident or pulling over a particular vehicle is clear and unmistakable from the circumstances. In the former context, the officer intends to stop no one, in the latter context, the officer intends to seize only the car stopped, not the cars "following the vehicle subject to the traffic stop."

*Al Nasser*, 555 F.3d at 730-31 (footnotes omitted).

Here, Holley initially stopped his car on his own volition and Agent Alvarenga's actions cannot even be characterized as the "but for" cause of Holley's initial decision. When Agent Alvarenga pulled in, he activated his lights for safety reasons. At that point, it is reasonable for Holley to have believed he was not free to go. However, Agent Alvarenga's activation of the lights was not done in order to make Holley stop. The agent testified that he had not run a records check before pulling in and did not have any intention to stop the vehicle until it pulled off the road.

As noted in *Al Nasser*, while "an encounter is *not* a seizure when a reasonable person would feel free to leave," this "do[es] not mean that an encounter *is* a seizure

8

1  just because a reasonable person would not feel free to leave." 555 at 728. The court

2  explained:

> "It is clear, in other words, that a Fourth Amendment seizure does not occur whenever there is a governmentally caused termination of an individual's freedom of movement (the innocent passerby), nor even whenever there is a governmentally caused and governmentally *desired* termination of an individual's freedom of movement (the fleeing felon), but only when there is a governmental termination of freedom of movement '*through means intentionally applied*.'"

7  555 F.3d at 728 (quoting *Brower*, 489 U.S. 593, 596-97). Thus, it is not enough that

8  the reasonable person believe he is not free to leave, the detention must also be

9  "willful." 555 F.3d at 728 (citing *Brower*, 489 U.S. at 596).

10  The facts here suggest that Alvarenga's seizure of Holley, such as it was, was

11  not willful, but was a consequence collateral to the agent activating his overhead

12  lights. The Ninth Circuit addressed a case with a similar twist in *United States v.*

13  *Chan-Jimenez*, 125 F.3d 1324 (9th Cir.1997). There, a police officer in an unmarked

14  vehicle followed a pickup truck that had not committed any traffic violations, but

15  "didn't appear to belong in the area." *Id.* at 1325. While following him, he ran a

16  check on the truck's license plates. After the officer had followed for a mile and a

17  half, the truck pulled over and the driver and a passenger got out and opened the

18  hood of the truck. *Id*. The officer pulled in behind the truck and "activated his

19  emergency lights to indicate he was a police officer;" he then got out of the vehicle

20  and identified himself to the truck's occupants. Id. The officer requested the driver's

21  license and the vehicle registration, both of which were provided and were found to

22  be "in order." *Id*. The officer nevertheless retained the license and registration and

1 asked for permission to search the truck.  The Ninth Circuit examined whether the
2 encounter between the officer and the truck's driver constituted a seizure.  *Id.* at
3 1326.  The court held that a seizure occurred when the officer did not return the
4 license and registration after determining they were in order.  The court did not
5 characterize the events up to that point-- the officer following the truck, pulling in
6 behind and activating his lights-- as a seizure.

7 Although the Government's case here is arguably not as strong as it was in *Al*
8 *Nasser*, it is similar to facts of *Chan-Jimenez*, but without the determinative retention
9 of the license and registration.  Though a closer case than either of those, the
10 outcome is dictated by the application of the Ninth Circuit instruction that "[a] person
11 is seized when he is 'meant to be stopped by [a particular law enforcement action] . .
12 . and [is] so stopped.'"  *Al* Nasser, 555 F.3d at 731.  Here, Holley voluntarily stopped
13 and there is no evidence that indicates Agent Alvarenga activated his lights meaning
14 to stop him.  While the lights may have caused Holley, or any reasonable person, to
15 believe he was seized, that was not the will of Agent Alvarenga and therefore the
16 encounter was consensual and no seizure occurred until the agent saw the marijuana
17 in the vehicle.

18 **III.   RECOMMENDATION**

19 Based on the foregoing, the Magistrate Judge **RECOMMENDS** that the
20 District Court, after its independent review, **deny** Defendant Holley's Motion to
21 Suppress (Doc. 20).

22

1 The Supplemental Motion to Suppress Statements (Violation of Miranda) (Doc. 28) was resolved by stipulation and the Magistrate Judge **RECOMMENDS** that it be **denied as moot**.

This Recommendation is not an order that is immediately appealable to the Ninth Circuit Court of Appeals. Any notice of appeal pursuant to Rule 4(a)(1), Federal Rules of Appellate Procedure, should not be filed until entry of the District Court's judgment.

However, the parties shall have fourteen (14) days from the date of service of a copy of this recommendation within which to file specific written objections with the District Court. *See* 28 U.S.C. § 636(b)(1) and Rules 72(b), 6(a) and 6(e) of the Federal Rules of Civil Procedure. Thereafter, the parties have fourteen (14) days within which to file a response to the objections. If any objections are filed, this action should be designated case number: **CV 11-3384-TUC-CKJ**. Failure to timely file objections to any factual or legal determination of the Magistrate Judge may be considered a waiver of a party's right to *de novo* consideration of the issues. *See United States v. Reyna-Tapia*, 328 F.3d 1114, 1121 (9th Cir.2003)(*en banc*).

Dated this 13th day of June, 2012.

Jacqueline Marshall
United States Magistrate Judge

11